908 P.2d 242

**Muriel BUCHANAN, Claimant–Appellant,**

**v.**

**KERR–McGEE CORPORATION, d/b/a Quivira Mining Company, Respondent–Appellee.**

**No. 16097.**

Court of Appeals of New Mexico.

Oct. 18, 1995.

Earl Mettler, Mettler & LeCuyer, P.C., Albuquerque, New Mexico, for Claimant–Appellant.

George W. Kozeliski, Gallup, New Mexico, for Respondent–Appellee.

## OPINION

BUSTAMANTE, Judge.

Muriel Buchanan (Claimant), widow of Henry Buchanan (Worker), appeals an order denying her claim for death benefits under the New Mexico Occupational Disease Disablement Law (the Occupational Disease Law). NMSA 1978, §§ 52–3–13 to –60 (Repl. Pamp.1991 & Cum.Supp.1995). Claimant raises two issues on appeal: (1) is Claimant's claim for death benefits barred by a settlement and release made by Worker during his lifetime, and (2) did the Workers' Compensation Judge (WCJ) err in deciding Worker's lung cancer was noncompensable because of the presence of a non-occupational risk factor? Deciding that there is no bar and that the WCJ applied an incorrect standard of proof to the facts, we reverse and remand.

## FACTS AND PROCEEDINGS

Worker was an underground uranium miner employed by Kerr–McGee Corporation d/b/a Quivira Mining Company (Employer) and its subsidiaries for more than twenty years. In 1985, Worker suffered a work-related back injury for which he filed a claim for workers' compensation benefits. In addition, Worker joined a silicosis claim under the Occupational Disease Law to the back

injury action. In 1987, the district court awarded Worker compensation benefits for his back injury. Contemporaneously, Worker and Employer entered into a settlement agreement with regard to the silicosis claim which required Employer to pay Worker $15,000 in exchange for a release (the Release) in full of all claims under the Occupational Disease Law. Worker signed the Release in January 1987. The Release included the following language:

> However, if it should develop that I did receive any other injuries or damages or was involved in any other accident or suffered any other exposure which might hereafter lead to another occupational disease disablement while employed by KERR–McGEE CORPORATION or QUIVIRA MINING COMPANY, f/k/a KERR–McGEE NUCLEAR CORPORATION, at any time, then this Release forever releases and discharges KERR–McGEE CORPORATION, QUIVIRA MINING COMPANY, f/k/a KERR–McGEE NUCLEAR CORPORATION, and their subsidiaries, insurers, successors and assigns, and their officers, agents, servants and employees who or which could or might possibly be liable for any such injuries, disablement or damages, whether discovered or latent or otherwise.

Worker and Employer stipulated that the settlement would bind Worker and "his dependents." Claimant did not read or sign the Release and she took no part in the negotiation and settlement of Worker's claims under the Occupational Disease Law.

In January 1993, Worker was diagnosed with lung cancer. Worker filed an occupational disease claim against Employer. In September 1993, Worker died of " '[m]etastatic squamous cell carcinoma of the lung' " while his claim was pending. Claimant eventually filed her own complaint seeking death benefits and medical expenses.

The WCJ ordered the case to be submitted on briefs and stipulated facts. After briefing, the WCJ dismissed Claimant's complaint on two grounds, each independently fatal to Claimant's course of action: (1) the Release bars Claimant's claim; and (2) Worker's disablement and death were not caused by an occupational disease arising out of his employment.

## DISCUSSION

With regard to issues of fact, we review this case using the whole record standard of review. See *Herman v. Miners' Hosp.*, 111 N.M. 550, 552, 807 P.2d 734, 736 (1991); *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 126–30, 767 P.2d 363, 365–69 (Ct.App.), *cert. denied*, 109 N.M. 33, 781 P.2d 305 (1988). Whole record review is not an excuse for an appellate court to reweigh the evidence and replace the fact finder's conclusions with its own, although it does allow the reviewing court greater latitude to determine whether a finding of fact was reasonable based on the evidence. *Herman*, 111 N.M. at 553, 807 P.2d at 737. With regard to issues of law, this Court determines whether the WCJ correctly applied the law to the facts, viewing the facts in the light most favorable to the determination below. See *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 113 N.M. 9, 12, 820 P.2d 1323, 1326 (1991); *see also Texas Nat'l Theatres, Inc. v. City of Albuquerque*, 97 N.M. 282, 287, 639 P.2d 569, 574 (1982).

### Issue 1. Does the Release Bar Claimant's Recovery for Death Benefits?

The WCJ determined that the express language of the Release bars Claimant's recovery of death benefits. The WCJ reached her decision by applying broadly accepted concepts of contract interpretation and public policy, with which we have no quarrel in the abstract. For example, the WCJ noted that the courts of New Mexico favor settlement and that settlements will be enforced in accordance with their terms absent an ambiguity in the terms of the settlement agreement or release. See *Ratzlaff v. Seven Bar Flying Serv., Inc.*, 98 N.M. 159, 163, 646 P.2d 586, 590 (Ct.App.), *cert. denied*, 98 N.M. 336, 648 P.2d 794 (1982). In addition, a settlement agreement or release can be challenged if there is a lack of consideration, fraud, misrepresentation, duress, mistake, undue influence, overreaching, or other factors supporting unenforcability. *Id. Hendren v. Allstate Ins. Co.*, 100 N.M. 506,

508, 672 P.2d 1137, 1139 (Ct.App.1993). Claimant did not assert that there was any ambiguity in the Release, and the WCJ found no evidence of fraud, misrepresentation, duress, or other grounds for challenging the Release. Absent a direct challenge to the facial validity of the Release, the WCJ held that Worker had released Employer from all claims arising under the Occupational Disease Law.

 The WCJ's decision presupposes that Worker's valid release is also effective to release Claimant's cause of action as a surviving dependent under the Occupational Disease Law. We disagree with this premise and the conclusion that follows from it. We hold that Claimant, as Worker's widow and dependent, has independent statutory rights to death benefits which arise upon Worker's death, and Claimant is not bound by the Release. The claim of a dependent arising from the death of a worker is a new and separate claim and is not derivative of the worker's claim. *See Gonzales v. Sharp · & Fellows Contracting Co.,* 48 N.M. 528, 537–38, 153 P.2d 676, 681–82 (1944); 2 Arthur Larson, *The Law of Workmen's Compensation* § 64.10 (1995). A unilateral settlement or release by a worker of his or her own claims does not bar the surviving dependent's claim even if the release signed by the worker explicitly purports to release the dependent's claim, as was the case here. *Brown v. General Aniline & Film Corp.,* 127 N.J.Super. 93, 316 A.2d 478, 480 (Ct.App.Div. 1974), *aff'd per curiam,* 65 N.J. 555, 325 A.2d 689 (1974); *Fossum v. State Accident Ins. Fund,* 289 Or. 787, 619 P.2d 233, 237 (en banc), *reh'g denied and modified,* 290 Or. 267, 624 P.2d 1074 (1980); 2 Larson, *supra,* § 64.12 (1995). Our holding is in accord with the great weight of authority from other jurisdictions. *See Kay v. Hillside Mines, Inc.,* 54 Ariz. 36, 39, 91 P.2d 867, 870 (1939); *American Steel Foundries v. Industrial Comm'n,* 361 Ill. 582, 198 N.E. 687, 690 (1935); *Routh v. List & Weatherly Const. Co.,* 124 Kan. 222, 257 P. 721, 724 (1927); *In re Cripp,* 216 Mass. 586, 104 N.E. 565, 566 (1914); *Smith v. Kiel,* 115 S.W.2d 38, 41 (Mo.Ct.App.1938); *Viersen & Cochran Drilling Co. v. Ford,* 425 P.2d 965, 967–68 (Okla. 1967).

 Restated in the language of contract law, Claimant's cause of action under the Occupational Disease Law is a new and separate claim, and it is not barred by the Release because Claimant was not a party to the Release and received no consideration for relinquishment of her dependent's claim for death benefits. *See Fleet Mortgage Corp. v. Schuster,* 112 N.M. 48, 49, 811 P.2d 81, 82 (1991) (it is a general rule that one who is not a party to a contract cannot maintain suit upon it, nor is bound by it).

The Occupational Disease Law does not directly address the issue before us. That is, there is no specific provision of the Occupational Disease Law which explicitly states that survivor's benefits constitute a claim completely separate and apart from the worker's claim. In addition, there is no provision in the statute which addresses in any fashion the effect of a broadly worded release form executed by a worker but not signed by any of worker's dependents. We can glean, however, the outcome most compatible with the intent and purpose of the Occupational Disease Law by comparing its treatment of the worker's disability benefits with the treatment accorded dependent's death benefits.

Section 52–3–10(A) provides:

A. There is imposed upon every employer a liability for the payment of compensation to every employee of such employer who suffers total disablement by reason of an occupational disease arising out of his employment, subject to the following conditions[.]

In contrast, Section 52–3–10(B) provides:

B. There is imposed upon every employer a liability for the payment of compensation to the dependents of every employee in cases where death results from an occupational disease arising out of his employment, subject to the following conditions[.]

The Occupational Disease Law thus draws a clear distinction between an employer's obligation to its employees for benefits during their lifetime and an employer's obligation to "the dependents" of its employees for death benefits.

Similarly, Section 52–3–14(A), (B), and (G) distinguish between the benefits payable to the worker and those payable to the worker's dependents upon the worker's death. The benefits payable to dependents are: (1) funeral and medical expenses, (2) such other sums as the deceased may have been paid for disability, and (3) 700 weeks of death benefit payments. The language of Section 52–3–14(G) itself does not provide for a deduction, credit, or setoff against an employer's liability to dependents for death benefits on account of payments to a worker during his lifetime under the Occupational Disease Law. We conclude, therefore, that it was the intent of the legislature to award death benefits to a worker's dependents if death arises or proximately results from an occupational disease, notwithstanding what the worker received or was deemed entitled to receive during his lifetime.[1] It follows that surviving dependents are entitled to death benefits notwithstanding any release the worker may execute during his or her lifetime.

Employer argues that *Hubbs v. Sandia Corp.*, 98 N.M. 389, 648 P.2d 1202 (Ct.App.), *cert. denied*, 98 N.M. 478, 649 P.2d 1391 (1982), undercuts Claimant's position that worker and survivor benefits are independent of each other. *Hubbs* is distinguishable, however, because it dealt specifically with a statute of limitations issue. In *Hubbs,* the employer asserted the independence of disablement and death benefits in support of its argument that a disablement claim filed within the ten-year period of NMSA 1978, Section 52–3–10(C), could not be used to make a death claim timely when the death claim was filed after the statutory ten-year period had elapsed. The Court and the parties in *Hubbs* did not disagree that disablement and death claims are distinct and separate. *Id.* at 391, 648 P.2d at 1204. The only issue was whether their independence affected the statute of limitations issue presented. We held it did not because of the internal wording of the statute, but we did not compromise the distinction between employee's disablement benefits and the surviving dependent's death benefits.

Accordingly, we reverse the WCJ's determination that the Release acted to bar Claimant's recovery. Claimant's recovery of death benefits is, however, also contingent upon whether Claimant can show that Worker died from an occupational disease. We turn now to that issue.

***Issue 2.*** **Did the WCJ Err in Concluding That Worker's Death was Not Caused by an Occupational Disease Arising out of his Employment?**

The parties are at polar opposites in their analysis of this issue. Employer argues that disposition turns on a pure question of substantial evidence. Claimant argues that disposition turns on a question of law. Claimant argues that the WCJ applied an incorrect legal standard placing on her an erroneous, and overly onerous burden, to prove that work-related factors were the predominant causative agents of Worker's lung cancer. We believe Claimant's approach is closer to the mark, though either analysis yields the same result.

In the order denying Claimant's benefits, the WCJ concluded as a matter of law that:

11. As an independent and separate bar the deceased worker and the surviving spouse failed to establish by medical testimony the Worker's disablement or death were directly and proximately related to an occupational disease arising out of his employment.

This conclusion of law was premised on the following findings of fact:

20. The experts agreed there were two possible causes of the deceased worker's lung cancer, one being cigarette smoking, the other exposure to radon-daughters.

21. Both Dr. Burns and Dr. Coultas determined the independent risk factors of cigarette smoking and radon exposure at approximately 24% for smoking and 22% for radon exposure.

---

1. In this case, however, we believe and Claimant concedes that the language of the Release effectively bars Claimant from receiving that component of death benefits consisting of any payments Worker might have received during his lifetime.

22. The medical records of the deceased worker indicate an extensive history of smoking. The records are inconsistent with the testimony of the worker and his wife.

23. Worker advised his doctors he had been smoking since 1959.

24. The doctors recorded the information provided to them by the doctors in the Worker's medical records.

25. Dr. Daniel W. Pennington, testified the deceased worker was still smoking in 1993 at the time of his lung cancer diagnosis.

26. Dr. Coultas' opinion was based upon his belief the deceased worker quit smoking in 1980. This assumption was used in determining the risk of contracting lung cancer.

27. Dr. Coultas' [sic] indicated the worker's risk was higher if he was still smoking.

28. Dr. Archer also assumed the worker had quit smoking in 1980. Dr. Archer was then asked to assume the worker continued smoking until 1985 or 1986 or until his diagnosis of lung cancer in 1993. Making that assumption Dr. Archer indicated the risk of cancer as a result of the smoking would be significantly greater.

29. Dr. Burns also assumed the worker quit smoking in 1980 but when ask[ed] to assume the worker was still smoking at the time of the diagnosis of cancer he indicated the primary factor causing the worker's cancer was the smoking and not factors related to his employment.

30. Considering the testimony of the experts it is the opinion of the administration the worker failed to establish he suffered from a total disablement or death by reason of an occupational disease arising out of his employment.

It is clear from these findings, and from testimony which was not acknowledged in the findings, that the WCJ felt she was required to decide as between Worker's smoking and his radon-daughter exposure which factor "actually" caused Worker's fatal lung cancer. The thrust of the WCJ's findings is that she had no evidence upon which she could decide that the radiation exposure caused the lung cancer, as opposed to Worker's smoking habit, and that therefore Claimant had not met her burden.

The WCJ did not make findings as to the amount of radon-daughter or smoking exposure Worker suffered. In addition, the WCJ's findings did not acknowledge the interactive character of the disease risks created by the combination of Worker's long smoking history and his twenty year exposure to radon daughters in uranium mining. Each of the experts, both Claimant's and Employer's, testified that the smoking and the radiation exposure combined to create the cancer. An expert retained by Employer, Dr. Burns, testified as follows:

> I concluded that both his cigarette smoking and his exposure to ionizing radiation contributed to the occurrence of his lung cancer. I am convinced from his medical record that he clearly did have lung cancer, and it is of the type that is produced by cigarette smoking and ionized radiation.

The experts, both Claimant's and Employer's, used the same analytical formula (Bier IV) to measure the relative impact of smoking versus radiation exposure on Worker's risk of contracting cancer. The differences between the experts as to the relative influences of smoking and radiation exposure depend on the basic assumption used concerning the length and intensity of Worker's smoking habit. The record is replete with evidence detailing the differences in relative potential causality flowing from changes in the basic assumptions. It would serve no purpose to recount the testimony in detail, however, because the differences are only a matter of degree. It is undisputed that none of the experts assigned a zero causation probability to Worker's radiation exposure, and all of the experts' calculations agreed that radiation exposure caused a significant increase in the risk of cancer compared to the risk from smoking alone. This testimony can be ignored only if one assumes that the Occupational Disease Law requires that work-related exposure must predominate before an occupational disease can be found and before benefits are payable. The Occupational Disease Law does not require this showing.

■ We hold that under the Occupational Disease Law, work-related factors need not be the predominant causative agent of the occupational disease or death, so long as the work-related factors can be reasonably categorized by medical experts as a non-negligible contributing cause as a matter of medical probability. Once again, the Occupational Disease Law does not provide a specific answer to the issue presented. We are guided to our conclusion by the Occupational Disease Law, the New Mexico Workers' Compensation Act, NMSA 1978, §§ 52–1–1 to –70 (Repl.Pamp.1991 & Cum.Supp.1995), and cases thereunder, as well as cases from foreign jurisdictions interpreting occupational disease statutes similar to New Mexico's statute.

The section of the Occupational Disease Law addressing causation, Section 52–3–32 reads as follows:

> The occupational diseases defined in Section 52–3–33 NMSA 1978 shall be deemed to arise out of the employment only if there is a direct causal connection between the conditions under which the work is performed and the occupational disease and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not have been foreseen or expected but after its contraction must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence. In all cases where the defendant denies that an alleged occupational disease is the material and direct result of the conditions under which work was performed, the worker must establish that causal connection as a medical probability by medical expert testimony. No award of compensation benefits shall be based on speculation or on expert testimony that as a medical possibility the causal connection exists.

There is scant case law interpreting this section of the Occupational Disease Law.

Cases interpreting it so far have dealt with determining whether a worker was totally disabled or died from an "occupational disease" within the meaning of the statute. *See Martinez v. University of California,* 93 N.M. 455, 457, 601 P.2d 425, 427 (1979) (whether a disease is occupational and, hence, compensable depends upon whether there is a recognizable link between the disease and some distinctive feature of the employment); *see also Chadwick v. Public Serv. Co.,* 105 N.M. 272, 274, 731 P.2d 968, 970 (Ct.App.1986), *cert. denied,* 105 N.M. 290, 731 P.2d 1334 (1987). These cases do not address the nature of the causative link required by the statute between occupational risks and resulting disease or death.

However, in wording and structure Section 52–3–32 is similar to Section 52–1–28 of the Workers' Compensation Act. Since both statutes deal with different aspects of coverage for occupational harm, it is reasonable for us to look for guidance to the more developed case law under Section 52–1–28 to determine proof requirements under the Occupational Disease Law. Section 52–1–28 provides:

> A. Claims for workers' compensation shall be allowed only:
>
> (1) when the worker has sustained an accidental injury arising out of and in the course of his employment;
>
> (2) when the accident was reasonably incident to his employment; and
>
> (3) when the disability is a natural and direct result of the accident.
>
> B. In all cases where the employer or his insurance carrier deny that an alleged disability is a natural and direct result of the accident, the worker must establish that causal connection as a probability by expert testimony of a health care provider, as defined in Section 52–4–1 NMSA 1978, testifying within the area of his expertise.

■ In order to establish causation under the Workers' Compensation Act, a worker must show that his disability "more likely than not" was a result of his work-related accident. *See Herman,* 111 N.M. at 553, 807 P.2d at 737. It is settled that the contributing factor need not be the " 'major contributory cause'." *See Leo v. Cornucopia Restaurant,* 118 N.M. 354, 358 n. 2, 881 P.2d

714, 718 n. 2 (Ct.App.), *cert. denied,* 118 N.M. 430, 882 P.2d 21 (1994). The work-related cause may, in fact, be a minor factor so long as the worker establishes that, as a matter of medical probability, it was a cause of the disability. *Herman,* 111 N.M. at 553, 807 P.2d at 737.

We perceive the language of Section 52–1–28(A)(3) requiring a compensable disability to be "a natural and direct result of the accident" as the functional equivalent of the language in Section 52–3–32 requiring that the "disease ... must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence." We see no reason to impose a higher standard of proof of causation on claimants under the Occupational Disease Law than under the Workers' Compensation Act.

Other provisions of the Occupational Disease Law do not impose a higher standard. For example, in order to receive compensation under the Occupational Disease Law a worker must be totally disabled or must have died from an occupational disease. "Occupational disease" is defined under Section 52–3–33, as:

> any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such and includes any disease due to, *or attributable to,* exposure to or contact with any radioactive material by an employee in the course of his employment. (Emphasis added.)

The language "or attributable to" is most naturally read as implying a level of evidentiary rigor at least one step down from the phrase "due to" which could reasonably be read to require a showing of predominance.

Our holding is in accord with New Mexico cases dealing with the effect of pre-existing susceptibility to injury or illness on compensability. These cases can be fairly summarized as holding that the employer takes his employees as he finds them. That is, simply because a pre-existing or concurrent condition makes a worker more susceptible to injury does not affect the worker's entitlement to benefits under the Workers' Compensation Act. *Leo,* 118 N.M. at 359–60, 881 P.2d at 719–20; *Herman,* 111 N.M. at 553, 807 P.2d at 737; *Powers v. Riccobene Ma-*

*sonry Constr., Inc.,* 97 N.M. 20, 23, 636 P.2d 291, 294 (Ct.App.1980), *cert. quashed* (1981); *Reynolds v. Ruidoso Racing Ass'n,* 69 N.M. 248, 252–3, 365 P.2d 671, 674 (1961).

Our holding is also in accord with cases from other jurisdictions which have considered the effect of cumulative or combined risks on compensation for occupational diseases. These cases have dealt specifically with the analytical and testimonial difficulties inherent in determining compensability of diseases caused by the combined effect of smoking and work-related exposures to dust, asbestos, radiation, and various toxic fumes. *McAllister v. Workmen's Compensation Appeals Bd.,* 69 Cal.2d 408, 71 Cal.Rptr. 697, 445 P.2d 313 (1968) (en banc) (cigarette smoking worker exposed to smoke inhalation); *see Rutledge v. Tultex Corp./Kings Yarn,* 308 N.C. 85, 301 S.E.2d 359 (1983) (cigarette smoking worker exposed to cotton dust); *Bolger v. Chris Anderson Roofing Co.,* 112 N.J.Super. 383, 271 A.2d 451 (1970) *aff'd,* 117 N.J.Super. 497, 285 A.2d 228 (App.Div. 1971) (cigarette smoking roofer exposed to fumes and dust of tar, pitch, asphalt, asbestos). *See generally* 1B Larson *supra,* § 41.64(a)-(c). The majority rule in states with a statutory scheme similar to New Mexico's allows compensation without a showing that work-related exposures were the predominant cause of the disease or death. Cases denying compensation generally involved factual circumstances in which occupational exposures were minimal compared to the smoking history, or where the outcome was controlled by a restrictive statutory standard. *See Foster v. City of Detroit,* 56 Mich. App. 644, 224 N.W.2d 714 (1974); *Olson v. Fed. Am. Partners,* 567 P.2d 710 (Wyo.1977); *Hammond v. Hitching Post Inn,* 523 P.2d 482 (Wyo.1974).

Based on the foregoing, we conclude that the Occupational Disease Law does not require Claimant to prove that Worker's exposure to uranium was the only factor causing Worker's fatal lung cancer or even the major factor, as the WCJ apparently concluded. Rather, the Occupational Disease Law only requires Claimant to show that as a matter of medical probability there is a recognizable, non-negligible link between Worker's exposure to radiation as a miner for over twenty years and his risk of contracting lung cancer.

We do not believe that because the experts assigned different, or conflicting, causation probability percentages to the two major risk factors, smoking and uranium exposure, that only a "medical possibility" has been shown. *See Herman*, 111 N.M. at 553, 807 P.2d at 737. All of the experts assigned some percentage of causative probability or risk of contracting lung cancer to Worker's exposure to radiation. This confluence of the expert testimony raises Claimant's evidence above the realm of speculation. *Id.*

Accordingly, we reverse the WCJ's finding that Claimant failed to prove that Worker suffered total disablement or death by reason of an occupational disease arising out of his employment, and remand for reconsideration in light of our opinion.

We express no opinion as to the applicability of Section 52–3–43, but we do refer the parties to *Vincent v. United Nuclear–Homestake Partners*, 89 N.M. 704, 556 P.2d 1180 (Ct.App.), *cert. denied*, 90 N.M. 9, 558 P.2d 621 (1976), and 1B Larson *supra* Section 41–64(d) for guidance.

**IT IS SO ORDERED.**

ALARID and WECHSLER, JJ., concur.